Thomas PALENCHAR, et al., Plaintiffs

v.

Terrence Eli JARRETT, et. al., Defendants.

No. SKG–06–2998.

United States District Court, D. Maryland.

Aug. 8, 2007.

---

Natalie Wolf, Timothy E. Lengkeek, Young Conaway Stargatt and Taylor LLP, Wilmington, DE, Ronald H. Jarashow, Franch Jarashow and Smith PA, Annapolis, MD, for Plaintiffs.

George M. Church, Miles and Stockbridge PC, Baltimore, MD, for Defendants.

### MEMORANDUM OPINION

SUSAN K. GAUVEY, United States Magistrate Judge.

Currently pending before the Court is plaintiffs and counter defendant's [1] ("plaintiffs") Motion for Partial Summary Judgment, (Paper No. 45), and defendants and counter plaintiff's opposition thereto. (Paper No. 56). The issue is fully briefed, and a telephonic hearing was held before this Court on August 3, 2007. For the reasons discussed below, the Court DENIES plaintiffs' Motion for Partial Summary Judgment.

### I. Background and Procedural History

This case involves a collision between plaintiffs' vehicle and defendants' tractor trailer. The Court reviews the facts in the light most favorable to defendants, the nonmoving party. *See Mayor & City of Baltimore v. CSX Transportation, Inc.,* 404 F.Supp.2d 869, 871 (D.Md.2005) (quoting *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348).

### A. Party and Witness Testimony

On the night of July 20, 2006, Terrence Eli Jarrett ("defendant" or "Mr. Jarrett"), a tractor trailer driver employed by Brookneal Dressed Poultry, Inc. ("Brookneal") [2] for approximately the past eight years, had picked up a live load of chickens near Fruitland, Maryland, intending to drive them to New Market, Virginia. (Paper No. 56, Ex. D, 55–56) [hereinafter "Ex. D]). His tractor trailer ("rig" or "truck"), owned by Brookneal, was relatively new and fully equipped in compliance with Department of Transportation ("D.O.T.") specifications. (Paper No. 56, Ex. A, 35–36 [hereinafter Ex. A]; Paper No. 56, Ex. B, 73 [hereinafter Ex. B]). Both the tractor and the flatbed trailer had running lights on the side. (Ex. A, 19; Ex. B, 73). The trailer, which measured 49 feet, also had alternating red and white retro reflective tape down its entire side. (Paper No. 56, Ex. C, 2 [hereinafter Ex. C]). White, yellow, and orange crates were stacked the full length of the trailer up to a height of 13 feet above the roadway. (*Id.*).

After picking up his load, defendant drove east along Stockyard Road, a two-lane east-west road, and then stopped at the stop sign located at the intersection of Stockyard Road and Route 13 ("intersection"), a four-lane north-south highway di-

---

1. Plaintiffs are Thomas Palenchar ("Mr.Palenchar") and Mary Jane Palenchar ("Mrs.Palenchar"), individually, and as parents and next friends of Kelly Palenchar ("Kelly") and Kimberly Palenchar ("Kimberly"). (Paper No. 2, 1). Only Mr. Palenchar was named as a counter defendant in defendants' Counter Claim. (Paper No. 5, 1).

2. When the Court uses the term "defendants," it is referring to both Mr. Jarrett and Brookneal. However, all direct negligence claims against Brookneal were dismissed on July 19, 2007. (Paper Nos. 60 and 61).

vided by a grass median strip. (Ex. D, 32–33). The area around the intersection is not illuminated by any streetlights. (Paper No. 56, Ex. G, 18 [hereinafter "Ex. G"] ). While stopped and waiting two or three minutes for an opportunity to turn left onto northbound Route 13, defendant, as per his usual practice, activated his emergency flashers. (Ex. D, 33–34, 48). He had a clear view of over 2,000 feet to the north, and with no southbound traffic in view on Route 13, he started across the southbound lanes of Route 13 with the intention of finding an opening onto the northbound lanes. (*Id.* at 36, 42; Ex. C, 2–3). However, as he was crossing the southbound lanes, he saw traffic proceeding northbound and was unable to immediately make the desired left-hand turn. (Ex. D, 44–45). When stopped at the Route 13 median, defendant's tractor trailer, measuring a total of 68 feet, occupied both of Route 13's southbound lanes as well as the crossover area. (Ex. C, 2; Paper No. 56, 4). Despite his rig's location, defendant maintains that there was sufficient roadway behind the trailer for southbound vehicles to pass around him. (Ex. C, 39).

At approximately 10:00 pm on the same night, plaintiffs—Thomas, Mary Jane, Kelly, and Kimberly Palenchar—were returning to their home in nearby Princess Anne, Maryland from a swim meet that had taken place earlier that night in Seaford, Maryland. (Paper No. 56, Ex. E, 39, 43–44 [hereinafter "Ex. E"] ). Mr. Palenchar was driving a 2006 Honda Odyssey minivan ("minivan") which was proceeding southbound on Route 13 approaching Stockyard Road. (Ex. E). Mrs. Palenchar was asleep in the front passenger seat, Kelly was sleeping on the minivan's second bench seat, and Kimberly was lying down on the third bench seat. (*Id.* at 39). The minivan's cd player was not on, but Mr. Palenchar cannot recall whether the radio was playing.[3] (*Id.* at 47).

Three other vehicles were also traveling southbound on Route 13 in the vicinity of the intersection with Stockyard Road on the night of July 20, 2006. Trina Savage ("Ms.Savage") was closest to the intersection, traveling at approximately 55–60 miles per hour ("mph") in the right-hand lane. (Paper No. 56, Ex. F, 12 [hereinafter "Ex. F"] ). Raymond Rentschler ("Mr.Rentschler"), with his daughter, Summer Rentschler ("Ms.Rentschler"), as passenger, was directly behind Ms. Savage and traveling at approximately 55 mph. (Ex. G). In the fourth position, following the Palenchar's minivan, was Stacy Grant ("Ms.Grant"). (Paper No. 66).

According to defendant, drivers, such as Mr. Palenchar, traveling south on "Route 13 approaching Stockyard Road have an unobstructed view of the intersection for approximately 2,110 feet[.]" (Ex. C, 1–2). In addition, 642 feet north of the intersection, the solid white line dividing the right-hand southbound lane from the shoulder begins to deviate to the right, and at approximately 417 feet from the intersection, a right-turn lane for Stockyard Road is fully established. (*Id.* at 2).

At deposition, Ms. Savage testified that she was driving south on Route 13, already "way off" the Route 13 bypass, when she saw something that "did not look right." (Ex. F, 11). She got "really close" and said, "What in the world is that thing doing just parked right there in the middle of the road?" (*Id.*). She did not see any lights on the tractor trailer, nor did she see it moving. (*Id.* at 12–13). Deciding

she would either have to go around Mr. Jarrett's truck or wait until he got out of the way, Ms. Savage moved over to the right shoulder close to where it becomes a right-hand turn lane. (*Id.* at 11–21). By the time she reached the area of the intersection, Ms. Savage said she was "creeping" along in the turn lane. (*Id.* at 21–22). At no time did she have to "squeal" her brakes, even though she slowed down to approximately 10–20 mph from 55–60 mph. (*Id.*).

Mr. Rentschler, the second driver traveling southbound on Route 13, testified at deposition that he first became aware of the tractor portion of Mr. Jarrett's rig sitting in the median when he was between a clump of trees and a "How Sweet It Is" nursery sign, which is approximately 1,034 feet from the intersection of Stockyard Road and Route 13. (Ex. C, 2; Ex. G, 10–11, 23). After concluding that there had to be something attached to the tractor, he saw Ms. Savage's car swerve behind the trailer and her brake lights illuminate. (Ex. G, 11). Ms. Rentschler then stated to her father that there was a truck in the road. (*Id.*). At this point, Mr. Rentschler testified he could see the tractor and the trailer, (*id.*), and he could see three non-flashing marker lights illuminated on the trailer.[4] (Paper No. 45, Ex. A, 36–37). Mr. Rentschler let off the gas while at a distance of "over 100 yards" from defendant's rig. (Ex. G, 13–14). He indicated that he "had to put brakes on to stop" but did not have to "slam the brakes[.]" (*Id.* at 14). At no point did he see defendant's rig move. (*Id.* at 24).

As Mr. Rentschler let off the gas, the Palenchar's minivan passed him in the left-hand lane. (*Id.* at 15). Mr. Rentschler testified that his focus was then on the minivan, thinking that it would slow down.

(*Id.* at 47–48). When it did not, Ms. Rentschler started screaming, "He's going to hit the truck." (*Id.* at 48). In "an instant," Mr. Rentschler saw Mr. Palenchar's brake lights go on and the minivan hit defendant's tractor trailer. (*Id.*). The Rentschlers were approximately 50 feet from the rig when they pulled over after witnessing the collision. (*Id.* at 17).

Ms. Grant, the fourth driver, has stated via affidavit that she was traveling in the left-hand fast lane coming off of the bypass where Route 13 becomes a straightaway when she noticed flashing or blinking lights in the roadway. (Paper No. 66, 1). Although uncertain as to what it was, she was aware that something was in the intersection of Route 13 and Stockyard Road. (*Id.*). Moments after seeing the flashing lights, a minivan pulled into the fast lane in front of Ms. Grant's vehicle and did not slow down. (*Id.*). Ms. Grant began tapping her brakes to alert vehicles behind her about the obstruction in the roadway. (*Id.*). At no time did she need to slam her brakes; she stated that she slowed down normally, had no trouble avoiding Mr. Jarrett's rig, and had plenty of time to stop. (*Id.* at 1–2). Ms. Grant did not recall seeing the minivan's brake lights as it approached the truck or it slowing down before impacting the truck. (*Id.* at 2).

Following the collision, Mr. and Mrs. Palenchar had to be extracted from the minivan, and all four plaintiffs were taken to Peninsula Regional Medical Center Emergency Department. (Paper No. 45, 3; Ex. E, 53).

## B. Expert Testimony

Defendant indicates that, "[a]ccording to the investigating Trooper, Mr. Palenchar's minivan left a 64 foot skid mark leading up

---

4. Mr. Rentschler also testified that neither he nor his daughter noticed the reflector tape on

the trailer on the night of the accident. (Paper No. 45, Ex. A, 37–38).

to the point of impact." [5] (Paper No 56, 4–5). Defendant's expert, Robert L. Miller ("Mr.Miller"), a traffic accident reconstructionist, was able to examine the accident scene, take various measurements, inspect defendant's tractor trailer, and review deposition testimony of the parties and witnesses. (Ex. C, 1–2). Mr. Miller concluded that it was appropriate for Mr. Jarrett to pull away from the stop sign at the intersection of Stockyard Road and Route 13 while there was no southbound traffic in sight. (*Id.* at 2). It is his opinion that the tractor trailer was "in compliance with all [federal] lighting and conspicuity requirements[,]" and that Mr. Palenchar failed to observe the rig's conspicuity tape and lights in sufficient time even though several other drivers were able to do so. (*Id.* at 2–3).

Plaintiffs have retained two experts, David Stopper ("Mr.Stopper"), an accident reconstruction liability specialist, and Dr. Rudolf Mortimer ("Dr.Mortimer"), an engineer. (Paper No. 56, Ex. A and Ex. B [hereinafter "Ex. A" and "Ex. B" respectively]). At deposition, Mr. Stopper testified that, in order to complete a panic stop when traveling at 55 mph, the Palenchar's Honda minivan would require 129 feet of braking. (*Id.*, Ex. A, 47–48). Factoring in 2.5 seconds of "perception/reaction time," [6] which would amount to 201 additional feet, Mr. Stopper calculated a grand total of 330 feet necessary to stop the minivan. (*Id.*). He agreed with the investigating trooper that there were 64 feet of tire marking from the Palenchar's minivan but opined that "it's more likely than not that braking was occurring before the tire marks show[ed]." (*Id.* at 60). After questioning from defendant's counsel, Mr. Stopper

stated that if Mr. Palenchar had been able to react to the presence of the tractor trailer in the "1 second range sooner" and stay successfully on the brakes, he would have been able to bring the minivan to a stop. (*Id.* at 67–68). He further agreed with defendant's counsel that, if Ms. Savage testified she pulled onto the right shoulder before the right-hand turn lane began, she "began her reaction to seeing something blocking" the southbound lanes of Route 13 at a distance of approximately 600 feet from the trailer. (*Id.* at 95–96). Moreover, assuming a best case scenario of 2.5 seconds of reaction time and a driving speed of 60 mph, Mr. Stopper indicated that Ms. Savage's perception of the road blockage could have occurred some 220 feet prior to her actual reaction or a total of over 800 feet from the intersection. (*Id.* at 96–97).

At his deposition, Dr. Mortimer concurred with Mr. Stopper's conclusion that there were no DOT violations with respect to the equipment on defendant's tractor trailer. (Ex. B, 73). He testified that the type of reflective tape that was on the trailer may be visible from a distance of 800 to 1,000 or more feet when illuminated by low beam headlights, especially on a dark night. (*Id.* at 76–77). Dr. Mortimer agreed with defendant's counsel that if three sets of headlights-i.e., Ms. Savage's, Mr. Rentschler's, and Mr. Palenchar's-were shining on the trailer, it would have been easier to see than if only illuminated by one set of headlights. (*Id.* at 121–122). In addition, based on an assumption that it was operating, the center lamp on defendant's trailer would have been visible from a distance of about 400 feet. (*Id.* at 171–

---

**5.** Neither plaintiffs nor defendant have included this report with their filings.

**6.** Mr. Stopper indicated that for nighttime travel, he would probably start with a reaction time of 2½ seconds and increase it depending on the scenario presented by the circumstances of the accident he was investigating. (Ex. A, 48).

172). When asked why Mr. Palenchar was unable to avoid the tractor trailer, Dr. Mortimer replied, "Well, the simple answer is he just didn't see it in time, obviously." (*Id.* at 134–135).

### C. Procedural History

Plaintiffs' Complaint alleging negligence and/or gross negligence on the part of defendant was removed to this Court from the Circuit Court of Wicomico County, Maryland on November 13, 2006. (Paper Nos. 1 and 2). Defendants' Counter Claim asserting that Mr. Palenchar's negligence was the sole and proximate cause of the collision was also filed in this Court on November 13, 2006. (Paper No. 5). The pending Motion for Partial Summary Judgment, Opposition thereto, and Reply were filed on June 27, 2007, July 10, 2007, and July 24, 2007 respectively. (Paper Nos. 45, 56, and 65).

## II. Discussion

### A. Standard of Review

A moving party is entitled to summary judgment as a matter of law where "there is no genuine issue as to any material fact[.]" Fed.R.Civ.P. 56(c). The moving party bears the burden of showing "the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden then shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment may not be entered where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, a court must bear in mind that its role is not to "weigh the evidence and determine the truth of the matter" but to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be resolved in favor of either party." *Id.* at 249–250, 106 S.Ct. 2505.

### B. Parties' Arguments

Plaintiffs argue that: (1) defendant should be found liable as a matter of law based on his alleged violation of the "Boulevard Rule," codified under Md.Code Ann. Transportation § 21–403; and (2) there is no positive evidence of contributory negligence or unlawful conduct on the part of Mr. Palenchar that creates a factual issue for the jury. (Paper No. 45, 10–15). Defendants counter that: (1) Mr. Jarrett is not negligent as a matter of law, and therefore, the determination of his negligence is for the jury; and (2) the issues of Mr. Palenchar's contributory negligence and proximate cause for the collision are also matters reserved for the jury. (Paper No. 56, 15–16).

### C. The Boulevard Rule

Under Maryland Vehicle Law, the so-called Boulevard Rule states in relevant part as follows:

(a) Preferential right-of way at an intersection may be indicated by stop signs or yield signs placed in accordance with the Maryland Vehicle law . . . . (c) If a stop sign is placed at the entrance to an intersecting highway, even if the intersecting highway is not part of a through highway, the driver of a vehicle approaching the intersecting highway shall:

(1) Stop at the entrance to the through highway; and

(2) Yield the right-of-way to any other vehicle approaching on the through highway.

Md.Code Ann. Transp. § 21–403 (2006). "Right-of-way" is defined as "the right of one vehicle or pedestrian to proceed in a lawful manner on a highway in preference to another vehicle or pedestrian." Md. Code Ann. Transp. § 21–101(t) (2006).

■ Courts have long recognized that the Boulevard Rule's purpose is to "promote the free flow of traffic on main thoroughfares" and to ensure the safety of drivers. *See, e.g., Poteet v. Sauter*, 136 Md.App. 383, 416, 766 A.2d 150, 167 (Md. App.2001) (citations omitted); *Covington v. Gernert*, 280 Md. 322, 324, 373 A.2d 624, 625 (1977) (citations omitted). To that end, Maryland courts have determined that an unfavored driver's duty to stop and yield the right of way is "mandatory, positive, and inflexible." *See, e.g., Dean v. Redmiles*, 280 Md. 137, 147, 374 A.2d 329, 335 (1977) (citations omitted). Moreover, this duty persists until either the unfavored driver becomes part of the flow of traffic on the favored highway or until he has crossed it in its entirety. *Schramm v. Foster*, No. Civ. JFM–02–3442, 2004 WL 1882628, at *2 (D.Md.2004) (Motz, J.) (Motz, J.) (citing *Mallard v. Earl*, 106 Md.App. 449, 458, 665 A.2d 287, 292 (1995)).

■ When sued by a favored driver, the unfavored driver is "guilty of negligence as a matter of law in the absence of a showing of contributory negligence on the part of the favored driver."[7] *Poteet*,

136 Md.App. at 416–417, 766 A.2d at 167–168 (quoting *Mallard*, 106 Md.App. at 458, 665 A.2d at 292). *See also, e.g., Dean*, 280 Md. at 147–148, 374 A.2d at 336 (citations omitted); *Kopitzki v. Boyd*, 277 Md. 491, 495, 355 A.2d 471, 473 (1976) (citations omitted). Although a favored driver has the right to assume an unfavored driver will operate his vehicle in a law-abiding manner, he "does not enjoy an absolute right of way at all times and under all circumstances." *Schramm*, 2004 WL 1882628, at *3 (citing *Dean*, 280 Md. at 149, 374 A.2d at 336). He must operate his vehicle in a lawful and reasonably prudent fashion, and he may not proceed in the face of obvious danger. *See, e.g., id.* (citing *Dean*, 280 Md. at 148, 374 A.2d at 329; *Gazvoda v. McCaslin*, 36 Md.App. 604, 612, 375 A.2d 570, 575 (Md.App.1977)); *Dennard v. Green*, 335 Md. 305, 312–313, 643 A.2d 422, 426 (1994) (Bell, J.) (citations omitted); *Barrett v. Nwaba*, 165 Md.App. 281, 298, 165 Md.App. 281, 885 A.2d 392, 402 (citations omitted).

■ Indeed, even when applying the Boulevard Rule, Maryland courts have "never absolved a favored driver from all of the consequences of his or her unlawful driving while on the boulevard." *Dennard*, 335 Md. at 312–313, 643 A.2d at 426. However, to render the Boulevard Rule inapplicable and for the issue of contributory negligence to be submitted to the jury, the unfavored driver must not only show that the favored driver operated his car unlawfully but also that this "unlawful

---

**7.** As the Court of Special Appeals recently stated,

> [i]n a case where the favored driver is suing the unfavored driver, once the plaintiff establishes that he was driving unlawfully on the favored highway, the burden shifts to the defendant to produce evidence legally sufficient to create a factual dispute regarding the lawfulness of the plaintiff's actions

> or, in the absence of statutory violation, the plaintiff's contributory negligence. When the defendant fails to meet that burden, no issue for the jury is created, and if the plaintiff moves for judgment, the trial court must find the defendant negligent as a matter of law.

*Barrett v. Nwaba*, 165 Md.App. 281, 293, 885 A.2d 392, 399 (Md.App.2005).

behavior proximately caused the accident." *Poteet,* 136 Md.App. at 417, 766 A.2d at 168 (citations omitted). *See also* *Schramm,* 2004 WL 1882628, at \*3 (citing *Dean,* 280 Md. at 151–152, 374 A.2d at 338; *Mallard,* 106 Md.App. at 457, 665 A.2d at 291). Where the unfavored driver has presented "evidence from which a jury could conclude that [a] favored driver was inattentive, and that but for his inattention the accident could have been avoided, the favored driver's negligence becomes a jury issue." *Dennard,* 335 Md. at 316–317, 643 A.2d at 428 (quoting *Kopitzki,* 277 Md. at 495, 355 A.2d at 474). On the other hand, speeding alone is not ordinarily considered sufficient to strip a driver on a through highway of his favored status, *see* *Schramm,* 2004 WL 1882628, at \*3 (citations omitted), and courts have admonished that the relative rights of parties under the Boulevard Rule should not "depend on nice calculations of speed, time or distance[.]" *Dean,* 280 Md. at 150, 374 A.2d at 337 (citations omitted).

■ In the case *sub judice,* Mr. Palenchar was the favored driver under the Boulevard Rule, and defendant, as the unfavored driver, had a duty to yield the right-of-way to him until defendant had either crossed the entirety of Route 13 or entered into the flow of traffic on that favored highway. *See, e.g., Creaser v. Owens,* 267 Md. 238, 249, 297 A.2d 235, 241 (1972). Therefore, defendant should be found liable for the collision as a matter of law unless the evidence currently before the Court is sufficient that a reasonable person could find that Mr. Palenchar was contributorily negligent and his negligence was a proximate cause of the collision in question. *See Schwier v. Gray,* 277 Md.

631, 635, 357 A.2d 100, 103 (1976) (citations omitted) (indicating that the test to be applied is whether reasonable minds differ as to whether a favored driver's conduct "was commensurate with the conduct of a reasonably prudent person acting under like or similar circumstances"); *Poteet,* 136 Md.App. at 416–417, 766 A.2d at 167–168.

## D. Defendant's Negligence and Plaintiff's Contributory Negligence as a Matter of Law

Because there is a question of material fact as to whether Mr. Palenchar was contributorily negligent and the proximate cause of the accident, defendant cannot be found negligent as a matter of law under the Boulevard Rule.[8] *See Schramm,* 2004 WL 1882628, at \*2 ("[T]he unfavored driver, when sued by the favored driver, is guilty of negligence as a matter of law in the absence of a showing of contributory negligence on the part of the favored driver.") (quoting *Mallard,* 106 Md.App. at 458, 665 A.2d at 292); *Dean,* 280 Md. at 147–148, 374 A.2d at 336 (citations omitted). *See also Goosman v. A. Duie Pyle, Inc.,* 206 F.Supp. 120, 126 (D.Md.1962) ("[T]he unfavored driver is not guilty of negligence, as a matter of law and in every case, merely because of his or her presence on the favored highway.").

■ According to the Boulevard Rule, a favored driver "may not proceed in complete disregard of obvious danger[,]" *see* *Dennard,* 335 Md. at 313, 643 A.2d at 426 (quoting *Dean,* 280 Md. at 148, 374 A.2d at 336), and there is evidence that, despite the lack of illumination at the intersection of Stockyard Road and Route 13 and Mr. Palenchar's apparent failure to see the tractor trailer, defendant's rig was both

---

**8.** Even outside of the context of the Boulevard Rule, Mr. Jarrett has presented evidence by way of expert testimony indicating that he was not negligent in pulling away from the

stop sign at Stockyard Road when there was no southbound Route 13 traffic in view. (Ex. C, 2).

visible from some distance as it sat across the southbound lanes of Route 13 and avoidable by approaching vehicles.

First, according to plaintiff's experts, defendant's truck was equipped as per DOT requirements. (Ex. B, 73). Mr. Rentschler testified that marker lights on the trailer were visible from at least 100 yards away. (Paper No. 45, Ex. A, 36–37; Ex. G, 13–14). Ms. Grant stated that she saw flashing lights in the roadway as soon as she came off of the Route 13 bypass. (Paper No. 66, 1). In addition, the reflective tape on the trailer may be seen from a distance of over 800 feet when illuminated by a car's low beam headlights. (Ex. B, 76–77). Adding to the rig's visibility was the fact that it was stacked to a height of 13 feet above the roadway with light-colored crates. (Ex. C, 2).

Second, neither Ms. Savage nor Mr. Rentschler ever saw defendant's rig move, (Ex. F, 13; Ex. G, 24), and Mr. Jarrett testified that, after pulling into the median to wait for an opportunity to turn left into the northbound lanes, some 15 or 20 seconds passed before the trailer was hit. (Paper No. 65, Ex. B, 36–37). Rather than pulling out into the southbound lanes with traffic immediately approaching, defendant's rig sat immobile for some time in the middle of the intersection giving oncoming drivers a greater opportunity to react to his presence. *Cf. Harper v. Higgs*, 225 Md. 24, 36, 169 A.2d 661, 666 (1961) (stating that a favored driver is not entitled to rely on the usual assumption that an unfavored car will not enter the boulevard when evidence exists that it has already come in and stalled).

Third, and by far most importantly, two drivers proceeding southbound ahead of Mr. Palenchar on Route 13, i.e., Ms. Savage and Mr. Rentschler, were able to avoid hitting the side of defendant's trailer without having to either "squeal" or "slam"

their brakes. (Ex. F, 21–22; Ex. G, 14). Despite being "really close" before realizing defendant's trailer was blocking the roadway, Ms. Savage had time to be aware of the rig, question its presence, decide to go around the trailer rather than wait for it to move, and slow down to 10–20 mph before driving safely around the back of the rig. (Ex. F, 11–22). For his part, Mr. Rentschler saw defendant's trailer in the median from as far back as 1,000 feet, and he was more than 100 yards from the intersection when both he and his daughter realized the rig was in the road. (Ex. C, 2; Ex. G, 10–11, 23). When asked at deposition whether he had "any trouble stopping to avoid hitting the truck[,]" he said no. (Ex. G, 17). Furthermore, Ms. Grant, who was traveling in the fast lane behind defendant, indicated that she did not have to "slam" her brakes and had plenty of time to stop in order to avoid hitting the defendant's truck. (Paper No. 66, 1–2).

From the above evidence, which, plaintiffs' assertions notwithstanding, constitutes more than "mere speculation[,]" (Paper No. 65, 4), from which a reasonable person could conclude that the rig was visible from some distance and inattention on the part of Mr. Palenchar or his failure to exercise ordinary care, as represented by Ms. Savage and Mr. Rentschler's ability to perceive and avoid impacting defendant's trailer, was the proximate cause of the collision. *See Kopitzki*, 277 Md. at 496, 355 A.2d at 474; *Brown v. Ellis*, 236 Md. 487, 497, 204 A.2d 526, 530–531 (1964) ("The law of negligence insofar as perception is concerned, requires a person to give to his surroundings the attention that a reasonably prudent person would consider necessary under the circumstances, and he must use his sense to discover what is readily apparent.") (citations omitted). *Compare Schramm*, 2004 WL 1882628, at

512

*4 (finding that unfavored driver had offered no evidence other than mere speculation that, had favored driver not exceed the speed limit, he could have avoided the accident) (citation omitted); *Jenkins v. County Board of Education*, 21 Md.App. 1, 12 318 A.2d 250, 257 (1974) (finding that "it would require sheer speculation for a jury to declare that the favored driver's conduct was a contributing cause to the collision").

When viewing the evidence in the light most favorable to defendants, the Court finds that a genuine issue of material fact exists as to whether Mr. Palenchar, who was unable to prevent a collision with Mr. Jarrett's tractor trailer, or Mr. Jarrett, who failed to yield the right-of-way, proximately caused the collision in question. Therefore, both Mr. Jarrett and Mr. Palenchar's negligence are matters for the jury in this case.

## E. Doctrine of Last Clear Chance

■ In addition to their arguments regarding the Boulevard Rule, the parties disagree about the applicability of the doctrine of last clear chance ("doctrine"). Defendants argue that they are entitled to rely upon the doctrine in so far as they are prosecuting a Counter Claim against Mr. Palenchar. (Paper No. 56, 23). They contend that, based on the testimony of eyewitnesses to the accident, Mr. Palenchar could have avoided impacting Mr. Jarrett's trailer. (*Id.*). Plaintiffs counter that the last clear chance doctrine is only available to the unfavored driver in cases where that driver is the plaintiff and that the doctrine's intent is to be a shield for a plaintiff whose contributory negligence would bar recovery rather than a sword for a defendant found negligent as a matter of law. (Paper No. 65, 7). Plaintiffs further maintain that, even if the doctrine were available to defendants, they have failed to

prove the required elements of the doctrine. (*Id.* at 8).

The Court need not reach the issue of whether an unfavored driver may rely on the doctrine in any instance, because the Court finds the doctrine does not apply in the case *sub judice.*

Maryland courts have recognized three basic elements that, if satisfied, will allow a contributorily negligent plaintiff to recover damages from a negligent defendant: (1) defendant's negligence; (2) plaintiff's contributory negligence; and (3) "[s]omething new or independent affording defendant a fresh opportunity to avert the consequences of defendant's original negligence and plaintiff's contributory negligence." *See, e.g.,* MPJI–Cv 19:14 ("citations omitted"); *Burdette v. Rockville Crane,* 130 Md.App. 193, 216, 745 A.2d 457, 469 (Md. App.2000) (citing *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 638, 495 A.2d 838, 847 (1985)). Courts have stressed this third element, stating that the doctrine is not applicable "where the contributory negligence of the plaintiff is concurrent with the primary negligence of the defendant." *See Liscombe,* 303 Md. at 638, 495 A.2d at 847 (quoting *Sanner v. Guard,* 236 Md. 271, 276, 203 A.2d 885, 888 (1964)); *Burdette,* 130 Md.App. at 216, 745 A.2d at 469 ("For the doctrine to apply, the acts of the respective parties must be sequential and not concurrent.").

In the instant case, when regarding Mr. Palenchar as counter-defendant, the evidence currently before the Court indicates that his inattention and Mr. Jarrett's failure to yield constituted concurrent, rather than sequential, acts of negligence. *Compare* 16 M.L.E. *Negligence* § 86 ("To bring the doctrine ... into play, the negligence of the defendant must be sequential to that of the plaintiff, and not concurrent thereto.") (citations omitted). Moreover, Mr. Palenchar's inattention constituted a sin-

gle, continuous act of negligence, not a primary act of negligence followed by a second act of negligence. *See Benton v. Henry*, 241 Md. 32, 35, 215 A.2d 226, 228 (1965) ("The defendant's act of primary negligence may not be used again to serve as the last clear chance of avoiding the injury."). In other words, while he arguably should have detected the presence of the truck hundreds of feet before he actually did, this duty did not constitute a "fresh opportunity to avoid the harm that occurred," but instead amounted to a continuing obligation to exercise reasonable care by paying attention to obstacles in the roadway. *See Nationwide Mutual Insurance Co. v. Anderson*, 160 Md.App. 348, 358, 864 A.2d 201 (2004) (citation and internal quotation marks omitted). Mr. Palenchar's negligence must have been "subsequent to [Mr. Jarrett's] negligence and additional to his earlier negligent acts." *Id.* at 208, 864 A.2d 201. *See also Johnson v. Dortch*, 27 Md.App. 605, 614, 342 A.2d 326, 332 (Md.App.1975) ("The doctrine presupposed a perilous situation created by defendant's negligence and plaintiff's contributory negligence and assumes that there was a time *after* such negligence has occurred when the defendant could, and the plaintiff could not, by the use of means available avert the accident.") (emphasis in original).[9] Because the parties' negligence was concurrent and because no clear chance presented itself to Mr. Palenchar to avoid the collision with Mr. Jarrett's truck, the doctrine is not applicable to defendant's Counter Claim.[10]

### III. Conclusion

For the foregoing reasons, the Court DENIES plaintiffs' Motion for Partial Summary Judgment.

---

9. *Compare Burdette*, 130 Md.App. at 218, 745 A.2d at 470 (defendant's "negligent speeding and possible inattentiveness was concurrent with [decedent's] negligent inattentiveness. After she pulled out in front of him, and he first realized that a collision was possible, there is no evidence of a fresh opportunity to avoid the collision.") *with Ritter v. Portera*, 59 Md.App. 65, 72, 474 A.2d 556, 559 (Md.App. 1984) (finding that, although plaintiff was contributorily negligent in getting on the hood of defendant's stationary car, defendant had the last clear chance to avoid the accident by not driving off with plaintiff so situated).

10. Even when considering Mr. Palenchar as plaintiff, the elements of the doctrine are not met. First, much like Mr. Palenchar's inattentiveness, Mr. Jarrett's failure to yield the right of way was essentially one continuous act of negligence. Second, there is no evidence before the Court that Mr. Jarrett had a last clear chance to avoid the collision. He was basically trapped between two choices, either pulling into the northbound lanes despite approaching vehicles or backing up his tractor trailer across Route 13's southbound lanes and along Stockyard Road. (Paper No. 56, Ex. D, 5–8). When asked at deposition whether he considered putting his truck in reverse and getting out of the intersection, Mr. Jarrett replied that he had not, because "I may not see somebody I could back up overtop of. You can't put a tractor-trailer in reverse and just expect to back up like a car. There is no way of knowing if I had vehicles behind me. And that is just a totally, totally taboo thing to do." (*Id.* at 8). Plaintiffs have not presented any evidence to counter this statement. Neither pulling into oncoming traffic nor backing up across an intersection without being able to see what potentially lies in one's path constitutes a fresh opportunity to avoid an accident. 16 M.L.E. *Negligence* § 85 ("the doctrine is inapplicable where the defendant, by exercise of ordinary care, has no opportunity to avoid the accident") (citations omitted). Having arguably already been negligent in situating his rig in the intersection and across two lanes of traffic, defendant would have been unwise to cause a secondary accident in an effort to avoid a primary one.